S90A0821, S90X0822. DOOLEY et al. v. DAVIDSON et al. (two cases).

(397 SE2d 922)

WELTNER, Justice.

1.

Two newspapers made a request for documents to the University of Georgia, pursuant to the Open Records Act, OCGA § 50-18-70 (a), as follows:

This letter is a formal request, made individually and on behalf of The Atlanta Journal and The Atlanta Constitution, to inspect and/or copy all records and documents associated with the income of all University of Georgia coaches, particularly that of head basketball coach Hugh Durham. NCAA rules require that job-related outside income be reported to the university president.

The material should include but not be limited to: Information regarding income from shoe contracts, camps, endorsements, TV-radio shows and speaking engagements.

Two coaches and the athletic director of the university filed a complaint for declaratory judgment to determine whether certain records, in their possession and relating to their income, were subject to the Open Records Act. The coaches submitted 13 documents to the trial court for in camera inspection. The trial court found that eight of the 13 documents were subject to the Open Records Act. Both

sides appealed.

2.

(a) In *Macon Telegraph Publishing Co. v. Bd. of Regents*, 256 Ga. 443 (350 SE2d 23) (1986), we held that certain records of the Athletic Association of the University of Georgia are subject to the Open Records Act:

> Because [the Chairman of the Board of the Athletic Association], by virtue of his position as President of the University of Georgia, is charged with controlling the intercollegiate sports program at the University, and because the maintenance of documents relating to the assets, liabilities, income, and expenses of the intercollegiate sports program is an integral part thereof, we conclude that, regardless of whether the documents are prepared by employees of a private Athletic Association or by [its treasurer], it is clear that they are "documents, papers, and records prepared and maintained in the course of the operation of a public office," and are therefore "public records" under the Open Records Act. [Id. at 445.]

The issue before us is whether the records in question are "public records" under OCGA § 50-18-70 (a), which provides as follows:

> As used in this article, the term "public record" shall mean all documents, papers, letters, maps, books, tapes, photographs, or similar material prepared and maintained or received in the course of the operation of a public office or agency.

(b) It follows that each of the 13 documents before us must be reviewed to determine whether it is material "prepared and maintained or received in the course of the operation" either of the university or of the association. A document that is "prepared and maintained or received in the course of [such] operation" is a "public record," and must be offered for inspection and copying. A document that is *not* so "prepared and maintained or received in the course of [such] operation" is *not* a "public record," and is not subject to the requirements of the Open Records Act.

3.

The statutory terms, "in the operation of a public office or agency," must be considered in the light of what the record shows concerning the operation of the university and the association. The

record discloses that:

(a) The Board of Regents of the University System of Georgia requires of all employees the submission of written reports of "activities" (as defined), and "approval of the President."[1]

(b) Additionally, contracts between the association and the coaches are contingent upon compliance with all requirements of the National Collegiate Athletic Association (NCAA).[2]

(c) The constitution of the NCAA requires each coach to report annually "all athletically related income from sources outside the institution . . . through the director of athletics to the institution's chief executive officer."[3]

(d) The constitution of the NCAA also requires that no coach shall accept any compensation from the manufacturer of any athletic equipment in exchange for the use of its equipment without prior approval of "the institutions's chief executive officer."[4]

---

[1] § 802.1601D of the Board of Regents Policy provides:
For all activities, except single-occasion activities, the employee shall report in writing through official channels the proposed arrangements and secure the approval of the president or his designee prior to engaging in the activities. Such activities include consulting, teaching, speaking, and participating in business or service enterprises.

§ 802.1602 provides in part:
Each unit of the University System shall adopt guidelines governing consulting activities of faculty members which shall include the following:
A. A plan for reimbursing the institution for use of the institution's personnel, facilities, equipment and/or materials consistent with rates charged outside groups or persons.
B. A procedure for obtaining prior approval of the president or his designee.
C. A procedure for defining and prohibiting conflicts of interest.

[2] Such contracts provide in part:
The party of the second part [the coach] agrees and understands that he may be suspended by the party of the first part [the association] for a period of time, without pay, or his employment may be terminated if he is found to be involved in violations of NCAA or SEC regulations, Athletic Department policies, or University policies related to the conduct of the University's athletic programs.

[3] § 3-2-(g) of the Constitution of the NCAA requires athletic coaches to report to the president of the university, as follows:
The coach annually shall report all athletically related income from sources outside the institution (including, but not limited to, income, annuities, sports camps, housing benefits, complimentary-ticket sales, television and radio programs and endorsement or consultation contracts with athletic shoes, apparel or equipment manufacturers) through the director of athletics to the institution's chief executive officer.

[4] See § 3-6-(i), as follows:
Staff members of member institution's athletics department shall not accept, prior to receiving approval from the institution's chief executive officer, compensation or gratuities of any kind whatsoever, either directly or indirectly, from an athletic shoe, apparel or equipment manufacturer in exchange for the use of such merchandise during practice or competition by the institution's student-athletes.

(e) The university instituted a written policy in 1985 requiring the review of personal contracts relative to athletic equipment.[5]

## 4.

(a) By the promulgation of these regulations, the Board of Regents has regulated the "course of the operation" of the university and of the association in such manner as to limit the acceptance by employees of compensation from sources other than their public emoluments, and to require that its employees report income received from specified sources. The university has required that its athletic director review certain contracts relative to the donation of athletic equipment and by the contractual requirement that its employees comply with the rules of the NCAA.

(b) It follows that:

(i) Records in the hands of employees that pertain to the receipt of athletic equipment and apparel are records that relate to the operation of the university and of the association, and are records "received in the course of the operation of a public office or agency."

(ii) Records of outside income received in connection with the operation of the university and the association are records "received in the course of the operation of a public office or agency."

(iii) Records in the hands of employees that have been prepared for the purpose of complying with reporting requirements relating to specified income are records "prepared and maintained . . . in the course of the operation of a public office or agency."

---

[5] The policy prescribes:

Effective immediately, all personal contracts which provide the donation of athletic equipment (shoes, rackets, bats, etc.) to a given sport are to be reviewed annually by the Athletic Director.

The endorsement compensation clause may remain private by "whitening out" the statement on the submitted copy of the contract. The measures indicated below will be given careful consideration:

1. The currency of the contract.
2. The number and kind of each item will be ascertained to include the items in equipment inventory.
3. Records will be maintained by the Equipment Manager as to who receives each piece of equipment. (Equipment is primarily for team members and coaches.)
4. A system for checking-out and/or replacing equipment will be adhered to.

## 5.

Conversely, records in the hands of employees that may reflect the receipt of income from outside sources are *not* "public records" *if* the payment to an employee is based upon an activity of the employee that is *not* conducted "in the course of the operation of a public office or agency."[6]

## 6.

With this understanding of the Open Records Act and the requirements of the Board of Regents and the university, it becomes necessary to examine each one of the documents in issue to determine whether it is a "public record." We find that the documents fall within six categories.

(a) Documents 1, 2, and 3 are the reports prepared by the coaches in preparation of their annual reports of outside income to the chief executive of the university. While the reports themselves were not submitted to the president, each was "prepared and maintained" for the purpose of performing a duty imposed upon the coaches "in the course of the operation of a public office or agency." Hence they are "public records," and must be disclosed.

(b) Documents 5, 6, 7, 10, and 13 are contracts between individual coaches and suppliers of sports equipment or apparel. The contracts provide that such equipment and apparel will be furnished to university athletes, and, in some contracts, provide that the coach require or encourage university athletes to use or wear these articles. Some of these contracts are contracts that are required to be reviewed by the athletic director pursuant to regulations of the university. Each contract directly affects the performance of official duties by the coach, and otherwise relates directly to the activities of the university and of the association. Because they are documents "received in the course of the operation of a public office or agency," they are "public records," and must be disclosed.

(c) Documents 8 and 9 are letters relating to compensation of coaches for participating in radio programs that are broadcast before and after athletic events. The evidence indicates that the broadcasts are sold to radio stations as part of the university's exclusive rights to broadcast university football and basketball games, and are identified to listeners as being a part of the "Georgia Bulldog Network." The broadcaster is the university; the subjects of the broadcasts are the

---

[6] Plain examples would be income that is received by an employee: as dividends upon shares of stock; or as interest paid on a bond or certificate of deposit; or from the sale of real or personal property; or as compensation for personal services (not otherwise prohibited) that are not a part of, and do not involve, the operation of a public office or agency.

athletic events of the university; and the purpose of the broadcast is to foster the athletic programs of the university. Because these documents relate to an official function of the university, they are documents that are "prepared and maintained . . . in the course of the operation of a public office or agency." Hence, they are "public records," and must be disclosed.

(d) Document 11 concerns financial information relative to radio and television broadcasts. The evidence indicates that the television shows are produced and videotaped at university facilities and are paid for by the association. These promotional activities of the university are copyrighted in the name of the "Athletic Association/University of Georgia." Because this document relates to an official function of the university, it is "prepared and maintained . . . in the course of the operation of a public office or agency." Hence, it is a "public record," and must be disclosed.

(e) Document 4 is styled "Consultant Appearance Agreement." It obligates the coach only to make speaking appearances on behalf of a manufacturer. Standing alone, a contract to speak on behalf of a third party — unconnected with and not in conflict with the performance of an official duty — relates to a *private* activity, and is not a "public record." Hence, it is not a "public record," and need not be disclosed.

(f) Document 12 is a contract between a coach and the producer of a radio network, in which the coach agrees to provide commentary during the broadcast of certain basketball games. To the extent that the contract requires, or authorizes, commentary relating to a game in which a unit of the University System of Georgia is a participant, the coach's activity would be conducted "in the course of the operation of a public office or agency," and the contract would be a "public record." To the extent that the coach's activity relates to athletic events other than those involving units of the University System of Georgia, it would be private conduct. A contract that is *limited to* such private conduct is not a record "received in the course of the operation of a public office or agency," and hence is not a "public record." There is no evidence that Document 12 relates to athletic events involving the University of Georgia. Hence, it is not a "public record," and need not be disclosed.[7]

---

[7] Having concluded a review of each of the 13 documents in issue, we note that current directives of the Board of Regents or of the university require the reporting of the content of each document, either to the president or to the athletic director of the university. The fact that neither the board nor the university has insisted upon the filing of certain reports has led us to conduct our inquiry based solely upon the application of the statutory term, "in the course of the operation of a public office or agency." We do not undertake to enforce, by judicial decree, any directive promulgated by the Board of Regents or the university that has gone unenforced by the public agency itself.

## 7.

The 13 documents before us are those produced by the coaches in response to discovery motions. In applying the requirements of the Open Records Act, we have employed a standard differing from that of the trial court. For this reason, the case will be remanded to the trial court for further direction, and for such additional discovery as may be appropriate in order to assure full compliance with the Open Records Act.

*Judgment affirmed in Case No. S90A0821 and case remanded. Judgment affirmed in part, reversed in part in Case No. S90X0822, and case remanded. All the Justices concur, except Clarke, C. J. and Smith, P. J., who dissent.*

CLARKE, Chief Justice, dissenting.

I believe the law should clearly inform a public employee as to which of his documents and records are his own and which are public records subject to the Open Records Act. I fear the majority opinion fails to afford that clear guidance.

I would establish this rule: Any record required by law or by order of a superior to be maintained on file in a public agency becomes a public record under the act. Those documents and reports prepared and kept for personal use do not fall under the act.

SMITH, Presiding Justice, dissenting.

I would remand this case to the trial court, but in so doing would direct the court as follows: Unless a contract, paper, document, report, letter, memorandum, or like paper, or instrument was received and filed by the University of Georgia or the Athletic Association of the University of Georgia, it would not be "in the course of the operation of a public office or agency" and, therefore, not subject to disclosure. To hold otherwise would be to allow a blatant invasion of personal privacy.

To label as public records the reports of the coaches, set out in Division 6 (a) of the majority opinion, that are used to prepare their annual report is ridiculous. The annual report tells all. Must the coach produce his work sheets, adding machine tapes, computer information, etc., on the basis that they are "in the course of the operation of a public office or agency?" If the University and Athletic Department are satisfied with the annual report as filed, it is no one else's business.

Are the appellees intimating that the University and or Athletic Association would cover up and not do their job? If private memos, etc. are deemed public records today — what tomorrow? Leave the coaches their privacy. Papers not in the possession or filed with the

University or Athletic Association are private papers.

DECIDED NOVEMBER 29, 1990.

*Chilivis & Grindler, Nicholas P. Chilivis, Anthony L. Cochran,* for appellants.
*Michael J. Bowers, Attorney General, George P. Shingler, Senior Assistant Attorney General, Rogers & Hardin, Hunter R. Hughes III, Dow, Lohnes & Albertson, Terrence B. Adamson, Peter C. Canfield, James A. Demetry,* for appellees.